IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michelle Roberts, | ) | |
| on behalf of M.R. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 cv 1935 |
| v. | ) | |
| | ) | Magistrate Judge Arlander Keys |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of | ) | |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michelle Roberts (plaintiff or "Ms. Roberts") has filed a motion for summary judgment seeking judicial review of the final decision of the Commissioner for Social Security ("Commissioner"). Ms. Roberts seeks Supplemental Security Income ("SSI") under Title XVI of the Social Security Act on behalf of her minor child ("M.R."). The parties consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons set forth below, Ms. Roberts' motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted. The Social Security Administration's November 17, 2009, decision is affirmed.

**I. PROCEDURAL HISTORY**

On September 26, 2006, M.R.'s mother, Ms. Roberts, applied for SSI disability benefits on behalf of her minor child, alleging disability since her birth, on January 2, 1997, due to

bipolar disorder, psychosis and attention deficit/hyperactivity disorder (ADHD). (R. 178-83). The claim was denied on February 7, 2007, and upon reconsideration on May 17, 2007. (R. 109; R. 115). Thereafter, Ms. Roberts filed a written request for hearing by an Administrative Law Judge (ALJ). (R. 121-22). An initial hearing was held on April 27, 2009, in Oak Brook, Illinois, before ALJ Steven H. Templin. (R. 68, 131). The ALJ continued the case for submission of updated records. A supplemental hearing was held October 2, 2009. (R. 19, 154). M.R., Ms. Roberts, and Medical Expert (ME) Kathleen O'Brien testified at the hearing. M.R. was represented by an attorney at both hearings. (R. 19).

On November 17, 2009, the ALJ denied Ms. Robert's claim for benefits and found the minor child not disabled under the Social Security Act. (R. 93-104). Ms. Roberts appealed, and on March 17, 2011, the Appeals Council denied her request for review, causing the ALJ's decision to constitute the final decision of the Commissioner. (R. 6). The final decision of the Commissioner is reviewable by the District Court under 42 U.S.C. § 405(g).

**II. M.R.'s HISTORY**

**A. Medical Evidence**

M.R. was born on January 2, 1997. On April 19, 2006, Dr. Mohammed Ahmed conducted a psychiatric evaluation on M.R. Ms. Roberts reported disorganization and disruptive behaviors. M.R. was said to be failing all subjects in the second grade and, at the age of 9, was diagnosed with ADHD and oppositional defiant

disorder. (R. 259-60). On September 14, 2006, M.R. was admitted to Streamwood Hospital, following bouts of extreme aggression towards her siblings. (R. 282). At an initial psychiatric evaluation on September 16, 2006, M.R. made very poor eye contact and had "very poor focus and concentration ... Her thoughts were very disjointed and at times [she] answered questions in inappropriate ways". (R. 280). M.R. was admitted to Streamwood Behavioral Health Center for demonstrating "very aggressive behavior," and for evaluation and diagnosis of her emotional functioning for the purpose of treatment. (R. 264; R. 269.)

On September 21, 2006, M.R. underwent another psychological evaluation to assess her current level of cognitive functioning and personality dynamics. (R. 263). This evaluation was conducted by Clinical Psychologist, Michael Di Domenico. (R. 263-70). M.R. had been reportedly isolating herself and hearing multiple voices. She was observed to have underlying anxiety. (R. 264). M.R. obtained a full scale I.Q. score of 89, placing her in the low average range of intelligence. (R. 265). She was noted to have difficulty with mathematical concepts and a "learning disability for arithmetic." (R. 267). M.R. presented as depressed and there appeared to be "a significant amount of turmoil and unrest in her life." (R. 269). Psychological testing strongly suggested that she lacked insight into her behaviors and that she was easily stressed with limited coping skills. (*Id.*). M.R. was "easily distracted and hyperactive." (*Id.*). She was diagnosed

with bipolar disorder with psychotic features, ADHD, and a mathematics disorder, and assigned a Global Assessment of Functioning ("GAF") of 40. (R. 270). The GAF is a subjective scale that measures a person's social, occupational, and psychological functioning. Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994). The scale ranges from zero to one hundred, and a lower score indicates more difficulty with social, occupational, or psychological functioning. *Id.* A GAF of 50 indicates either: "serious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id.* M.R. was started on the following medications: Risperdal and Concerta. (R. 316). M.R. was discharged on October 13, 2006. (R. 303).

On January 15, 2007, Joseph M. Nemeth, M.D. performed a psychiatric evaluation of M.R. for SSA. (R. 315-16). M.R. and her mother reported visual and auditory hallucinations, impulsivity, irritability, and difficulty concentrating (R. 316). Dr. Nemeth diagnosed a psychotic disorder. (R. 317).

Jerrold Heinrich, Ph.D., a non-examining reviewer, completed a childhood disability evaluation form for SSA on January 30, 2007. (R. 320). He found less than marked impairments in attending and completing tasks, interacting and relating with others, and caring for herself. (R. 321-22).

M.R. was diagnosed as myopic in a vision examination report dated February 20, 2007. (R. 313). On April 25, 2007, M.R. was

seen by Dr. Sivakumar for medication management. (R. 360). Dr. Sivakumar noted reports of rage and increased anger. (*Id.*). Dr. Sivakumar ordered the decrease of Risperdal, and M.R. was started on Depakote. (*Id.*).

On May 5, 2007, Julio Pardo, M.D., and Margaret Wharton, Psy.D., completed a childhood disability evaluation form for SSA. (R. 331-36). They found less than marked limitations in attending and completing tasks, interacting and relating with others, and in health and physical well being. (R. 333-34).

On May 16, 2007, M.R.'s mother reported to Dr. Sivakumar that M.R.'s behavior had gotten worse on Depakote. (R. 361). Depakote was discontinued and M.R.'s dose of Risperdal was increased. (*Id.*). On June 13, 2007, Dr. Sivakumar wrote that Ms. Roberts had been unable to comply with increased dose of Risperdal and that M.R.'s behavior was unchanged. (R. 362). When she returned on July 18, 2007, Ms. Roberts noted improvement in M.R.'s condition with the increased dose of Risperdal. (R. 364).

On August 15, 2007, Ms. Roberts reported that M.R. had been compliant with her medication and was taking Risperdal three times a day. (R. 363). Ms. Roberts described problems with focus and aggressive behavior. (*Id.*). Dr. Sivakumar diagnosed ADHD, intermittent explosive disorder, and bipolar disorder and increased her dose of Risperdal.(*Id.*).

M.R. did not show for her appointment on September 19, 2007. (R. 365). On October 17, 2007, Dr. Sivakumar wrote that M.R. was

not doing well in school. (R. 366). On November 21, 2007, Ms. Roberts told Dr. Sivakumar that M.R. was getting out of control at school. (R. 367). M.R. had told her mother that she was hearing voices again. (*Id.*). M.R. was noted to be in a trance and unable to speak. (*Id.*). Dr. Sivakumar changed the dosages of M.R.'s medications. (*Id.*).

On December 26, 2007, Ms. Roberts reported that M.R. was doing well, but that she was concerned that M.R. was not functioning at a fourth grade level. (R. 370). Dr. Sivakumar instructed that M.R's therapist be contacted about the school issues. (*Id.*). M.R. did not show for her scheduled appointments with Dr. Sivakumar in January and March. (R. 371-72). On April 16, 2008, Ms. Roberts told Dr. Sivakumar that M.R. was doing well in terms of her mood and at school. (R.373).

On June 11, 2008, Dr. Sivakumar noted that M.R. was becoming increasingly aggressive towards noon and into the evening. (R. 375). Dr. Sivakumar increased her Risperdal dose. (*Id.*). On July 23, 2008, Ms. Roberts claimed that increase of Risperdal had helped calm M.R. down. (R. 377). Dr. Sivakumar's notes from September 10, 2008, describe Ms. Roberts' frustration with M.R.'s school's failure to initiate an IEP due to multiple absences (R. 379). Dr. Sivakumar decreased M.R.'s afternoon Risperdal dose on December 3, 2008. (R. 380). On February 4, 2009, M.R. was noted to be doing well overall, but worse in school. (R. 381).

**B. Therapy Treatment**

M.R. took part in regular therapy sessions through the
Gateway Foundation from January 18, 2007, through the date of her
hearing. (R. 398- 483). These sessions took place at her school.
(R. 428). Progress notes from the Gateway foundation, dated
February 15, 2007, state that M.R. was doing well overall, but
had recently attacked her two-year-old sister. (R. 410). On
November 11, 2007, Ms. Roberts called the Gateway Foundation to
report increasingly aggressive behavior, dropping grades and
psychotic features. (R. 423). On November 20, 2007, Melissa A.
Hogan, M.P.H., wrote that Ms. Robert's concern for the mental
health of M.R. appeared genuine and that she expressed
frustration with the school for not creating an IEP. (R. 424). On
December 14, 2007, Ms. Hogan wrote that M.R. appeared not to
understand simple questions and was unable to make eye contact.
(R. 428).

On June 27, 2008, M.R.'s therapist Kurrum M. Butt met her at
her home and noted that M.R. seemed to get confused when asking
for more than one piece of information, but otherwise exhibited
good cognitive functioning. (R. 442). On September 24, 2008, Ms.
Roberts described her frustration with M.R.'s school over the
IEP. (R. 457). Mr. Butt noted that M.R. seemed "very frustrated
when talking about her problems with math; it appeared that she
[was] really motivated to learn but [was] genuinely facing
difficulty. (R. 458).

On October 8, 2008, Mr. Butt wrote that "most of [M.R.'s]

stresses emanate from her difficulties with mathematics." (R. 467). He noted that M.R. got frustrated even when she talked about math (*Id.*). Ms. Roberts expressed her frustration with the lack of support M.R. was receiving from her school on October 8, 2008. (R469).

On October 15, 2008, Mr. Butt again noted that M.R. "gets frustrated when she does not understand mathematics." (R. 470). On October 29, 2008, Mr. Butt observed that M.R. was very concerned about her studies and making real efforts at home with her home work. (R. 474). On May 4, 2009, Mr. Butt wrote that "M.R. seemed very frustrated during the session when talking about her performance in school and especially her ongoing issues with math." (R. 483).

In a letter dated May 26, 2009, Mr. Butt wrote:

> [M.R.] frequently fails to follow the cognitive flow of a conversation. She displays problems with memory. [M.R.] expresses a significant amount of frustration during her therapy sessions centering on her school work. The efforts she puts in her work do not yield corresponding grades. [M.R.] displays aggressive 'acting out' behaviors at home. She might be exhibiting similar behaviors at her school. However, as is sometimes the case with many children, [M.R.] might be exhibiting aggressive behavior at home as a consequence of her experiences at school. In [M.R.'s] case, this is a very strong possibility as counseling sessions with [M.R.] predominantly focus on her struggles at school and difficulties with getting through her school work. (R. 398).

## C. School Records

On June 27, 2007, Ms. Roberts received a letter from her daughter's school regarding M.R.'s "excessive absences/tardies." (R. 486). On October 17, 2008, M.R.'s principal wrote Ms. Roberts

a letter regarding her attempts to have M.R. tested for special education eligibility. (R. 487). The letter states that the school did not consider testing necessary, because M.R. did not usually wear her glasses, she was near grade level in all subjects except for math, and that her missed assignments were to blame for her math struggles. (*Id.*). The letter also notes that M.R.'s teacher reported that M.R. was doing well and had no concerns.( *Id.*). On March 27, 2009, Ms. Roberts received another letter from her daughter's school regarding M.R.'s "excessive absences/tardies." (R. 488).

A questionnaire completed by M.R.'s teacher, Colleen Zaresh, on May 14, 2009, notes multiple moderate difficulties in school. (R. 390- 95). Another questionnaire completed by M.R.'s teacher, Lisa Hylles, on May 12, 2009, notes a few moderate difficulties in school. (R.383-88).

M.R. received no failing grades in the third grade and was enrolled in regular classes. (R. 489). In fourth grade, she received Fs in mathematics and science/health, and Ds in social studies, reading, and language. (R. 492). M.R.'s standardized test scores in reading, mathematics, and science were "below standards." (R. 494). In fifth grade, she received a D in mathematics and Cs in social studies, science/health, and reading. (R. 495).

## III. Hearing Testimony

### A. The Initial Hearing

At the time of the hearings, M.R. was 12 years old. At the
initial hearing on April 27, 2009, the ME testified that there
was no corroboration of the behaviors described by M.R.'s
therapist with those described by her school. She said that
M.R.'s most recent diagnoses were a mood disorder, not otherwise
specified, and ADHD. The ME believed that M.R.'s symptomology had
improved a "considerable amount" over the course of her therapy.
(R. 74). She noted that a good deal of the reports of her
aggression and difficulties occur at home (R. 75). The ME
considered Listings 12.04 and 12.11, but did not believe that
M.R. equaled either listing. (R. 76-79). With regard to
functional equivalence, the ME described difficulty formulating
an opinion in light of the stark contrast in the difficulties
described at home and the observations of M.R.'s teachers. (R.
80). The ALJ continued the hearing to allow M.R. the opportunity
to get updated individual therapy records. (R. 80-85).

### B. The Supplemental Hearing

At the supplemental hearing on October 2, 2009, the ME noted
a primary diagnosis of ADHD and a secondary diagnosis of bipolar
disorder. (R. 20). She did not consider M.R.'s psychotic disorder
a continuing diagnosis. Although the ME considered these
impairments to be severe, she did not believe M.R. met or equaled
a listing. She noted a "very stark difference between the
perception of this child and her behavior at school." (R. 21).
The ME pointed out that M.R. was not in any special education

classes and that her teachers did not rate more than moderate limitations. (*Id.*). She accounted for the differences in the therapist's opinion and those of her teachers by suggesting that her therapist was "working with the whole family as opposed to just the child," which she thought would indicate "that the difficulties [the] mother is reporting have to do with family situations and issues and therefore are not just insidiousness to the child's psychopathology." (R. 21).

Citing a low average I.Q., the ME did not believe that M.R. had any limitation in age appropriate cognitive functioning. (R. 23). She found a moderate limitation in age appropriate social functioning, a mild limitation in personal functioning, and moderate limitations in maintaining concentration, persistence or pace. (*Id.*). The ME did not see any limitations in acquiring or using information, caring for herself, or with M.R.'s physical well being. (R. 23-24). She found less than marked limitations in attending and completing tasks, and interacting and relating with others. (R. 24).

On cross examination, the ME was asked about the opinion of M.R.'s therapist that the difficulties M.R. has at home might be reflective of problems at school. (R. 24). The ME disagreed, stating that she believed the opposite, i.e., that when children act out in school, it can be reflective of things that are going on at home, but not the converse. (R. 24-25). The ME acknowledged that M.R. had undergone "quite a bit of therapy," but she

believed that this therapy was geared toward resolving difficulties that are happening in the household. (R. 25). The ME claimed that, although the majority of M.R.'s therapy sessions did not involve her mother, the only thing the therapist had to go on was M.R.'s mother's report. (R. 25).

When asked about M.R.'s poor scores in math, the ME noted a contradicting letter from M.R.'s principal which said that she was doing well in math. (R. 30). She noted that M.R. had missed math assignments and had a problem with truancy. (*Id.*). The ME claimed that, although M.R.'s standardized test scores fell in fourth grade, she did not think that the drop was statistically significant. (R. 32-34). The ME again attributed M.R.'s failing grades to poor attendance. (R. 34).

M.R.'s attorney argued that, in light of M.R.'s multiple diagnoses and failing grades, her school's decision not to evaluate her for an IEP was suspicious. (R. 34-41). The ALJ stated that he understood the attorney's point, but there was no direct evidence of an unremediated set of circumstances at the school. (R. 40-41).

M.R.'s mother, Ms. Roberts, testified that she rarely sat in on M.R.'s therapy sessions. (R. 42). Ms. Roberts described M.R.'s fourth grade teacher's observations of M.R. kicking chairs and throwing her fists in the air. (R. 43). She explained that this teacher, Ms. Elliot, was the one who encouraged her to seek an IEP. (R. 44). Ms. Roberts said that M.R. has good and bad days.

(R. 46).

When asked whether progress should be expected in the home setting after a couple of years of therapy, the ME responded that "all the therapy in the world" would do nothing so long as "the problems at home that precipitated the behavioral problems" were not changed. (R. 48). The ME conceded that M.R. was not involved in family therapy, but insisted that her parents were involved, because the therapist talked to her parents when they let him into their home. (R. 49). She noted that the school was concerned that M.R. was not wearing her glasses, and it was "no wonder she [could not] complete an assignment." (R. 50). Ms. Roberts testified that, aside from the principal's letter, she had never heard anyone say that M.R. was not wearing her glasses. (R. 51).

Ms. Roberts testified that M.R.'s school was denying a lot of IEP requests and that the principal who wrote the letter had been fired. (R. 54). Ms. Roberts had taken her complaints about the school to the local school board. (R. 55).

M.R. testified that she needs her glasses when she has trouble reading. She felt that math, science, and social studies were hard for her. (R. 56). M.R. had recently changed schools and said that she still had the same difficulties with math, science, and social studies. (R. 58). M.R. said that she fought with her sisters at home. (R. 60).

M.R. said that she got in trouble for throwing chairs in school during the fourth grade. (R. 61-62). She explained that

her therapist had taught her to think before she got angry and ask for help from her teachers when she got frustrated. (R. 63). M.R. took Concerta and Risperdal. She thought that her medications helped change her attitude. (R. 65).

## IV. DISCUSSION

### A. Social Security Regulations

#### 1. Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether the claimant is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir.2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.2007). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir.2007) (quoting *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004)).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue,* 573 F.3d 503, 513 (7th Cir.2009) (quoting *Craft*

*v. Astrue,* 539 F.3d 668, 673 (7th Cir.2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir.2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir.2002)).

### 2. Standard for Child SSI Benefits

A child is disabled within the meaning of the Social Security Act if he or she has a "physical or mental impairment, which results in marked and severe functional limitations, and which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). In determining whether a child meets this definition, the ALJ engages in a three-step analysis: (1) if the child is engaged in substantial gainful activity, then his claim is denied; (2) if the child does not suffer from a severe impairment or combination of impairments, then his claim is denied; and (3) the child's impairments must meet, medically equal, or be functionally equal to any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1. 20 C.F.R. § 416.924(b)-(d); *see also Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir.2007).

To determine whether an impairment functionally equals a listing, the ALJ must assess its severity in six age-appropriate categories: (1) acquiring and using information; (2) attending

and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Each domain describes what a child should be able to do throughout five age categories: (1) "newborns and young infants" (birth to age 1); (2) "older infants and toddlers" (age 1 to age 3); (3) "preschool children" (age 3 to age 6, including children in kindergarten, but not first grade); (4) "school-age children" (age 6 to age 12, including children in first grade through middle school); and (5) "adolescents" (age 12 to age 18). 20 C.F.R. § 416.926a(g)(2), (h)(2), (i)(2), (j)(2), (k)(2), (l)(2).

An impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. The functional equivalence analysis requires the ALJ to consider how the child functions as a whole. "[T]his consists of looking at all of the child's activities, which include everything the child does at home, at school, and in her community, and evaluating how the child is limited or restricted in those activities, without cabining the child's impairments into any particular domain." *Bielefeldt ex rel. Wheelock,* No. 09 C 50302, 2011 WL 3360013, at *4 (N.D.Ill. Aug.4, 2011) (citing 20 C.F.R. § 416.926a(b)-(c)).

**B. The ALJ's Decision**

On November 17, 2009, the ALJ denied Plaintiff's claim for disability benefits on behalf of M.R. (R. 93-104). After considering the record, the ALJ found that, during the period covered by the application, M.R. was a school-aged child and an adolescent for purposes of disability evaluation and that she has not engaged in SGA. (R. 96). The ALJ also found that, despite having at least one severe impairment, M.R.'s impairments did not meet or equal the Listings or functionally equal the Listings. (R. 96; 98). He found M.R. had "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks and interacting and relating with others, and had "no limitation" in the domains of moving about and manipulating objects and caring for herself. (R. 93-104).

In considering the severity of M.R.'s impairments, the ALJ relied on the opinions of the ME: "the board certified expert in forensic psychology reviewed all of the medical and educational evidence of record." (R. 97). "She [the medical expert] explained that there was a dichotomy between the claimant and her mother's reports concerning the claimant's behaviors and performance at school, and the records from the school." The ALJ also stated in his opinion that the ME noted that the "clinician's treatment records documented consistently normal mental status examinations of the claimant, with improvement of symptoms reported." (R. 97).

In finding that M.R. did not have an impairment or combination of impairments that met or medically equaled one of

the listed impairments; did not functionally equal a listing; had
less then marked limitations in acquiring and using information
(R. 98), attending and completing tasks (R. 100), interacting and
relating with others (R. 101); and was not disabled (R. 104), the
ALJ discussed the minor and her mother's testimony regarding her
difficulty in school. (R. 98-99). In addition to the medical
expert's opinions, the ALJ also discussed the specific number of
times that M.R. was absent from school, M.R.'s teacher's
questionnaires, her report cards, and the views of her therapist
in detail. (R. 99-101).

### C. Analysis

In her motion for summary judgment, Plaintiff claims that
the ALJ erred in denying M.R.'s claim in three ways. Plaintiff
claims that the ALJ erred: 1) in relying on the opinion of the
medical expert; 2) by failing to discuss Dr. Domenico's report;
and 3) by failing to reach an explicit credibility finding. In
response, the Commissioner filed a motion for summary judgement
requesting that the court affirm the ALJ's decision.

#### 1.    The ALJ's Reliance on the Medical Expert's Opinion

First, Ms. Roberts argues that the ALJ erred in relying on
the ME's opinion, because the ME disregarded M.R.'s at-home
behavior, and therefore, did not base her opinion on all of the
relevant evidence. Pl.'s Br. at 13. In support of this argument,
plaintiff sets forth that "where there is conflicting medical
evidence, it is the ALJ's duty to decide which to believe;

however, when a medical opinion is internally inconsistent it **should** be discounted" citing *Sedrak v. Callahan*, 987 F. Supp. 1063, 1067 (N.D. Ill. 1997). Pl.'s Br. at 11 (emphasis added by the court). Ms. Roberts argues that the ALJ erred by not considering all the evidence in favor of M.R. and by not discounting the school records, because they are inconsistent with M.R.'s doctors, therapists, and mother. *Id.* at 12. First, the Court must point out that in *Sedrak*, the case cited by Ms. Roberts, the Court states: "a medical opinion **may** be discounted if it is internally inconsistent or inconsistent with other evidence." 987 F. Supp. at 1067 (emphasis added). Therefore, the ALJ did not err by not discounting the school records in this case, as he was not required to do so even though plaintiff viewed them as inconsistent with other evidence in the record.

In response to plaintiff's arguments that the ME, and thus the ALJ, did not consider other contradictory evidence, including the at-home behavior of M.R., the Commissioner argues that the ME did properly consider this evidence in making his determination. Not only did the ALJ consider the school records, but he and the ME, Dr. O'Brien, considered all the evidence in the record, specifically: M.R.'s IQ score and a hospital work-up that indicated M.R. might have a learning disorder in math (R. 79), M.R.'s diagnosis of ADHD, the fact that M.R. took medication for ADHD, M.R.'s apparent improvement with medication, the school's lack of intervention (R. 79), the dichotomy between M.R.'s

mother's reports and M.R.'s teacher's report (R. 80), and the
therapist's records (R. 99-101).

In addition, Ms. Roberts argues that the ALJ improperly
disregarded the therapist Mr. Butts' opinion that M.R.'s
impairments are caused by her frustrations at school. Pl.'s Br.
at 12. Ms. Roberts argues that the government, the ME, and the
ALJ all "make the same mistake" by disregarding "M.R.'s behavior
at home and dismiss[ing] it as less relevant than her behavior at
school." Reply at 3. However, the ME and the ALJ did specifically
consider Mr. Butt's opinion in considering the denial of social
security benefits. (R. 97.)

If the evidence was considered, it is not this court's role
to re-weigh this evidence. This Court is to act as the reviewing
court and in reviewing this decision, the court may not engage in
its own analysis of whether the claimant is severely impaired as
defined by the Social Security Regulations. *Young,* 362 F.3d at
1001. Nor may it "displace the ALJ's judgment by reconsidering
facts or evidence or making credibility determinations." *Skinner,*
478 F.3d at 841. Therefore, since the ALJ and ME acknowledged and
considered the contradictory evidence regarding M.R.'s at-home
behavior and Mr. Butt's opinion, the ALJ did not err in coming to
his conclusions.

### 2. The ALJ's Alleged Failure to Discuss Dr. Domenico's Report

Next, Ms. Roberts argues that the ALJ erred by failing to
discuss the results of Dr. Domenico's psychological evaluation in

his opinion. Pl.'s Br. at 13. In support, she states that an ALJ "should consider and discuss all credible medical evidence that is supported by clinical findings and relevant to the question at hand" citing *Connour v. Massanari*, 173 F.Supp.2d 785, 799 (N.D. Ill. 2001). Ms. Roberts argues that, by neglecting to discuss contradictory evidence in his opinion, the ALJ failed to satisfy "the most minimal articulation standard." Pl.'s Br. at 14. However, as discussed above, the ALJ did set forth in his opinion the contradictory evidence he considered in coming to his decision.

In 2006, Dr. Domenico assigned M.R. a GAF score of 40, and diagnosed a bipolar disorder with psychotic features, ADHD, and a mathematics disorder. (R. 270). Dr. Domenico observed that M.R. had anxiety, hyperactivity, distractibility, limited coping skills and difficulty with math concepts. (R. 264, 269). Plaintiff asserts that Dr. Domenico's diagnoses and observations corroborate the observations of M.R.'s therapists and mother. Pl.'s Br. at 13. The Court in *Connor* states, "An ALJ may not discuss only the evidence that favors his conclusion, but rather he must articulate, at some minimum level, his analysis of the evidence to allow a reviewer to trace his path of reasoning." 173 F.Supp.2d at 799. In addition, "an ALJ need not provide a written evaluation of each piece of evidence or testimony." *See Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985).

In this case, since it was undisputed that M.R. showed aggression with her sisters at home, it was undisputed that she was hyperactive and distractible (having ADHD), and it was undisputed that M.R. had problems with math, Dr. Domenico's report was largely repetitious and the ALJ considered the issues in the report in his opinion, even though he did not state the report by name. Therefore, the ALJ did not only discuss the evidence that favored his conclusion, he also addressed the issues present in the report. Since the ALJ considered and addressed contradictory evidence similar to that of the report, he did not err in not including his analysis of the Dr. Domenico report in his opinion. Ms. Roberts' request for remand is denied.

### 3. The ALJ's Credibility Determination

Lastly, Ms. Roberts argues that the ALJ failed to make an explicit finding regarding the testimony provided by Plaintiff and M.R. Pl. Br. at 14. However, a "formal" credibility finding is not required. *See Arbogast v. Bowen*, 860 F.2d 1400, 1406 (7th Cir. 1988) ("[W]here the reasoning of the ALJ is apparent, we do not require the ALJ to articulate explicitly his credibility determination."). Moreover, "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012).

Even though the ALJ need not make an express credibility finding, the ALJ did consider the testimony of Plaintiff and

M.R., and noted the situations in which Plaintiff's testimony was contradicted by, or inconsistent with, the evidence of record (R. 98-103). Thus, by making an implicit, rather than explicit, credibility finding, the ALJ did not err.

## V. CONCLUSION

For the reasons set forth above, Ms. Roberts' motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted. The Social Security Administration's November 17, 2009, decision is affirmed.

Date: May 16, 2013        E N T E R E D:

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT